J-S41001-15; J-S41002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  T.B. & E.A., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  T.B., SR., FATHER | No. 146 MDA 2015 |

Appeal from the Decrees entered December 23, 2014,
in the Court of Common Pleas of Lancaster County,
Orphans' Court, at No(s): 2056 2013, 2057 2013

| | |
|---|---|
| IN THE INTEREST OF:  E.A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  T.B., SR., FATHER | No. 209 MDA 2015 |

Appeal from the Order entered January 6, 2015,
in the Court of Common Pleas of Lancaster County,
Juvenile Division, at No(s): CP-36-DP-0000081-2011

| | |
|---|---|
| IN THE INTEREST OF:  T.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  T.B., SR., FATHER | No. 210 MDA 2015 |

Appeal from the Order entered January 6, 2015,
in the Court of Common Pleas of Lancaster County, Juvenile
Division, at No(s): CP-36-DP-0000007-2010

BEFORE:  ALLEN, LAZARUS, and PLATT*, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED AUGUST 07, 2015**

Appellant, T.B., Sr. ("Father") appeals from the decrees entered on

December 23, 2014, terminating Father's parental rights to T.M.B. (born in

June of 2009) and E.R.A. (born in April of 2011) (collectively "the

_____

* Retired Senior Judge assigned to the Superior Court.

Children").[1]  Father also appeals from the orders entered on January 6, 2015, changing the Children's permanency goals to adoption.  We affirm.

When T.M.B. was born in June of 2009, Lancaster County Children, Youth and Social Services ("CYS") became involved due to the placement of T.M.B.'s older half-siblings, S.G.A. and D.J.A., in the legal and physical custody of CYS.  On June 26, 2009, Mother agreed to a voluntary Family Service Plan ("FSP") for T.M.B., and T.M.B. remained in Mother's custody. On August 28, 2009, a revised FSP was made for Mother and Father.  The FSP stated that Father was not allowed to have unsupervised contact with T.M.B. because of his past criminal record and a Protection from Abuse Act ("PFA") order that was in effect involving Mother.

On January 15, 2010, CYS filed separate petitions for temporary custody of T.M.B., S.G.A., and D.J.A., alleging that Mother was not complying with the FSP goals and she was facing eviction.  T.M.B., S.G.A. and D.J.A. were placed in the temporary physical custody of CYS.  A shelter care hearing was held on January 19, 2010, keeping all of the children in the temporary custody of CYS.  Father was present at the hearing.

On March 2, 2010, an adjudication hearing was held.  On March 3, 2010, the trial court adjudicated T.M.B. dependent, and T.M.B. was placed in

---

[1]  J.A.-S., ("Mother"), signed consents to adoption of the Children on September 24, 2013.   Mother also signed consents to adoption for S.G.A. and D.J.A., who are the Children's older half-siblings. The trial court confirmed Mother's consents to adoption on November 7, 2013.

the legal custody of CYS. She was returned to the physical custody of Mother. A second revised FSP was approved. Father's revised FSP goals included: (1) cooperating with CYS' assessment of his situation; (2) remaining free from drugs and alcohol; (3) completing parenting classes; (4) completing domestic violence classes; (5) staying crime free; (6) maintaining income; and (7) obtaining safe and stable housing. The order also directed Mother not to allow Father any other contact with T.M.B, and directed Father to have supervised one hour per week visits with T.M.B. at CYS.

On July 23, 2010, a permanency review order stated that Father did not comply with his permanency plan, and that he had contacted CYS stating that he did not want to work with CYS. Father last contacted CYS on March 22, 2010. Father was incarcerated at the Lancaster County Prison sometime in 2010, and he was released in June of 2011. On January 11, 2011, the trial court released legal custody of T.M.B. and her older siblings to Mother. On April 2, 2011, Mother gave birth to her fourth child, E.R.A. Mother refused to identify a father. On June 2, 2011, CYS became aware that Father was released from the Lancaster County Prison, and received reports that Father planned to move into the family's residence despite Father's no-contact order with T.M.B. On June 6, 2011, CYS filed a petition for temporary custody of T.M.B., E.R.A., S.G.A., and D.J.A, following police

- 3 -

reports alleging that Mother was drunk and left the Children unsupervised, and that Father was attempting to break into Mother's house.

A shelter hearing convened on June 7, 2011. At the hearing, Mother testified that the day Father was released from prison, he broke into her house despite Mother having an active PFA order against Father. A warrant for Father's arrest was issued for charges of aggravated assault, indirect criminal contempt and stalking. Father was incarcerated a month later. Following the shelter care hearing, the trial court ordered T.M.B., E.R.A., S.G.A., and D.J.A. to remain in the temporary custody of CYS. Since June 6, 2011, all four children have remained in CYS's legal and physical custody.

On September 26, 2011, following another hearing, the trial court adjudicated T.M.B. and E.R.A. dependent. The trial court ordered a Child Permanency Plan ("CPP") goal for reunification with the Children. Father's CPP goals included: (1) completing a mental health program; (2) completing a drug and alcohol program; (3) remaining crime-free; (4) completing domestic violence classes; (5) completing parenting classes; (6) maintaining stable income; (7) obtaining stable housing; and (8) maintaining a commitment to the Children. The trial court also ordered genetic testing to determine if Father was the father of E.R.A. On October 31, 2011, genetic tests revealed that Father was E.R.A.'s father.

Following the permanency review hearings on November 16, 2011, April 26, 2012, and July 23, 2012, the trial court found that Father was not

compliant with his CPP. On July 10, 2012, Father was released from jail. The criminal charges against Father were dismissed and reduced to a summary offense of harassment. The trial court found Father to be minimally compliant with his CPP following his permanency review hearings on September 11, 2012 and April 12, 2013. Father was deemed moderately compliant with his CPP following the permanency review hearings on June 11, 2013 and November 12, 2013.

On September 17, 2013, CYS filed a petition to involuntarily terminate Father's parental rights to the Children and a motion to change the goal to adoption. On August 12, 2014, the trial court held a hearing on the goal change and termination petition, where Father was present and represented by counsel. At the hearing, J.J., Father's mother ("Paternal Grandmother"); T.B., Father's daughter and the Children's half-sibling; Bethany Jenks, Father's probation officer; Dr. Suzanne Ail, a licensed psychologist; Jessica Landman, a CYS caseworker; and Father testified.

On December 23, 2014, the trial court entered its decrees terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). On January 6, 2015, the trial court entered its orders changing the Children's permanency goals to adoption. On January 6, 2015, a permanency review hearing was held. At the permanency review hearing, Ms. Landman and Father testified. Following the hearing, the permanency review order changed the Children's goal to adoption.

On January 16, 2015 and January 28, 2015, Father timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On February 12, 2015, this Court, *sua sponte*, consolidated the appeals. Father raises the following issues:

> I. May termination of parental rights pursuant to 23 Pa.C.S. sections 2511(a)(5) and (8) be granted against a parent even though the child was not removed from that parent's custody?
>
> II. Where, during the six months preceding the filing of the petition, the parent has consistently visited with his children, been cooperative with [CYS], and[,] if not completed, started work on, all areas of the permanency plan, may a termination still be granted based on the fact that the parent was initially uncooperative?
>
> III. Where at the time of the termination hearing, a parent has successfully completed all the goals of the permanency plan save parenting, which was suspended by the [trial] court because the petition had been filed, and where there is no evidence of current parental incapacity, is termination under 23 Pa.C.S. section 2511(a)(2) proper based on the parent's earlier delay in addressing the goals?
>
> IV. Is it appropriate to change the permanency goal to adoption where Father has made progress and completed most of his plan, remains cooperative, and where there is no evidence that [the] Children's best interests necessitate adoption?

Father's Brief at 15.

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an

abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.

*Id.* at 806. We have stated:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004). Here, the trial court terminated Father's

parental rights based on sections 2511(a)(1), (2), (5), and (8). Accordingly, we will focus on section 2511(a)(1) in our review.

In terminating Father's parental rights, the trial court relied upon section 2511(a)(1) and (b) which provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to section 2511(a)(1) as follows:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

- 9 -

> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

On appeal, Father contends that during the six months preceding the filing of the termination petition, Father has consistently visited with the Children, been cooperative with CYS, and if not completed, started work on, all areas of the permanency plan. *Id.* at 28-31.

In terminating Father's parental rights pursuant to section 2511(a)(1), the trial court reviewed the record and the evidence presented, and concluded that it is clear from the record that, for a period of six months preceding the filing of the petition for involuntary termination, Father failed to perform any parental duties for the Children. The Children were in the physical custody of CYS since June 6, 2011, and the legal custody of CYS since September 15, 2011.

The trial court found that Father did not begin working on his CPP until the Children had already been in CYS's custody for fifteen months.

> His progress was slow. As of the June 4, 2013 [p]ermanency [r]eview hearing, Father had still not completed his mental health evaluation, domestic violence treatment, and parenting. He was consistently attending his bi-weekly visits and it was acknowledged by the caseworker that visits went well. His progress was noted by the court to be moderate. It should be noted that he had signed a release for Nuestra Clinica, pertaining to a mental health evaluation and that [CYS] made the referral for an evaluation. However, he could not schedule an appointment because he did not have a social security card and he needed a new medical insurance card.
>
> At the time the [t]ermination [p]etition was filed, on September 17, 2014 and subsequently served upon Father on September 24, 2014, he had still not made any further progress on his plan. He was still working on his insurance issues regarding his mental health evaluation, but it had still not been scheduled and he had not even scheduled a domestic violence evaluation or started parenting.
>
> By the time of the thirty-month permanency review hearing on November 5, 2014, Father had finally completed a mental health evaluation and was placed on a list for a Personalized Parent Trainer [("PPT")], was attending parenting classes, and was waiting for his domestic violence evaluation. The delay in the PPT referral was the direct result of Father's failure to complete his mental health evaluation since September 16, 2011, when the [CPP] was approved. The domestic violence component of his plan was also pending since then.
>
> The thirty-six month [p]ermanency [r]eview hearing was held on May 20, 2014. Father had finally completed his domestic violence evaluation in December [of] 2013, and it was recommended he undergo treatment. He was also working with a PPT, but concern was expressed about what could be accomplished with the termination proceeding pending and without services being provided directly in the home. The [b]onding [a]ssessment evaluations had been completed, but the report was pending.

At the time of the [t]ermination [h]earing, on August 12, 2014, it was reported that Father had finally started his domestic violence treatment with Child First Family Service in late July of 2014. PPT services were suspended in late May, 2014 because of the pending termination proceeding and the need to increase visits and provide services in the home, if PPT services were to continue. Father had been compliant with PPT services up to that point in time. Father had continued to visit as scheduled.

The record supports the [trial c]ourt's conclusion that Father had not completed his plan as of September 24, 2014. Father alleges that he was actively working his plan and that he had initiated efforts on all parts of his plan prior to that date, or that any delay in starting was not his fault, so that his Court must consider everything he did up to the time of the [t]ermination [h]earing on August 12, 2014. He claims that his plan was completed as of August 11, 2014, when he received his domestic violence certificate of completion.

The record does not support Father's position that he had initiated services on all elements of his plan by September 24 2014. [CYS] actually, and consistently, worked with Father over the years. While the record reflects some obstacles in getting some services in place, it was ultimately the responsibility of Father to secure the services and complete his goals. It is unfortunate that he wasted the ten months when T.M.B. was in the legal custody of [CYS] in 2010-2011 and failed to work on any of the components on the FSP. It is unfortunate that he waited to do anything on the current [CPP] approved by the [trial c]ourt until almost [fifteen] months had lapsed. It is unfortunate that he could not schedule a mental health evaluation because he did not have his social security card or a recent insurance card. These types of delays in receiving services were the responsibility of Father. By the time Father slowly started to actively work on his goals [CYS] was, as required by law, seeking permanency. The record is clear that the majority of the delay was the result of Father's initial resistance to services, and subsequent conduct and behaviors. While Father did little, Mother, through the years, always seemed to do just enough to keep the goal as reunification. When Mother signed consents to adoption on September 24, 2013, the posture of this case suddenly changed. Father found

himself two years into placement, having not completed his goals for reunification with [the C]hildren.

The problem is that Father's progress started too late. He waited more than two years before appearing to get serious about completing his goals. He seemed content to allow others to raise [the] Children and parent them. The record is clear that he had not completed his plan as of September 24, 2013, and that while he was starting to make more progress, he had not started to actively work on the remainder of his goals under the plan.

Trial Court Opinion, 2/13/15, at 9-12 (footnote omitted).

The trial court found that Father failed to fulfill his parental duties and responsibilities for more than two years. *Id.* at 8. This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340. Therefore, we conclude that the trial court properly terminated Father's parental rights pursuant to section 2511(a)(1). We will not disturb the trial court's determinations. *In re M.G.*, 855 A.2d at 68, 73-74.

The trial court must also consider how terminating Father's parental rights would affect the needs and welfare of the Children relative to 23 Pa.C.S.A. § 2511(b). Pursuant to section 2511(b), the trial court's inquiry is specifically directed to a consideration of whether termination of parental rights would best serve the developmental, physical and emotional needs of

- 13 -

the child. ***See In Re C.M.S.***, 884 A.2d 1284, 1286-87 (Pa. Super. 2005), *appeal denied*, 587 Pa. 705, 897 A.2d 1183 (2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***Id.*** at 1287 (citation omitted). We have instructed that the court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***See id***.

Instantly, the trial court found that termination of Father's parental rights would serve the developmental, physical, and emotional needs and welfare of the Children. Trial Court Opinion, 2/13/15, at 13. The trial court credited Dr. Ail's testimony that the Children and Father do not have a meaningful bond or attachment. ***Id.*** Moreover, the trial court found, "if the bond could be repaired, any further delay in securing permanency for the Children would be unreasonable." ***Id.***

With regard to E.R.A.'s relationship with Father, Dr. Ail testified that E.R.A. would not be harmed if Father's rights to E.R.A. were terminated, and that it would be in his best interest to terminate Father's rights. ***Id.*** at 45, 47. Dr. Ail testified that E.R.A. does not have a "solid attachment to [Father]." ***Id.*** at 86.

With regard to T.M.B.'s relationship with Father, Dr. Ail testified:

[T.M.B.'s] attachment to [Father] is limited. And I note in my report that she did accept his hugs. She did let him place her in his lap. She let him participate in some activities with her. She

never, however, initiated or reciprocated those gestures or comments. When he would talk about loving her and each of the physical interactions that he had around an activity, she would follow by getting up and moving away from him and seek a different activity. That would create a break between them. [T.M.B.] clearly did not acknowledge his questions about returning to visit him at his home or what she would like to have in the future. And so I would describe her attachment to [Father] as really ambivalent. She did identify him as [d]addy. She did include him in her play, but I didn't see any sense of security in that attachment.

N.T., 8/12/14, at 44-45. Moreover, Dr. Ail testified that T.M.B. would not be harmed if Father's rights were terminated. *Id.* at 45. Ms. Landman testified that Father is "actively engaged" in visits with the Children and "pays attention to both of them." *Id.* at 111. Nonetheless, Ms. Landman opined that termination of Father's parental rights would be in the best interest of the Children. *Id.* at 112-113.

With respect to the Children's relationship with their foster parents, Dr. Ail testified that there is a "very strong attachment between the Children and foster parents". *Id.* at 40. Dr. Ail testified that E.R.A. has separation anxiety due to his desire to not be separated from his foster mother. *Id.* at 41. Dr. Ail explained that E.R.A. was placed with foster parents soon after birth and that E.R.A. has remained with them consistently. *Id.* Dr. Ail testified that T.M.B. "clearly has had a very stable placement there, and the family they have been placed with has been very warm, and loving towards them." *Id.* at 41. Dr. Ail testified that E.R.A. and T.M.B.'s "successes are fragile and incomplete, and removing them from the current foster parents

would be disastrous." *Id.* at 85. Ms. Landman testified that the Children are "doing really well" in their foster home, and "seem very comfortable there, very happy." *Id.* at 112.

While Father professed that he loves the Children, this Court has held that a parent's love of his child, alone, does not preclude a termination. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). In addition, our Supreme Court explained that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Upon careful review of the record, we find that competent evidence of record supports the trial court's determination that there was no bond between Father and the Children which, if severed, would be detrimental to the Children, and that the termination of Father's parental rights would best serve the needs and welfare of the Children. Thus, we will not disturb the trial court's determinations. *See In re M.G.*, 855 A.2d at 73-74. We affirm the decrees terminating Father's parental rights on the basis of section 2511(a)(1) and (b).

Next, we address Father's challenge to the change of the permanency goals for the Children to adoption. This Court has stated:

> When reviewing an order regarding the change of a placement goal of a dependent child pursuant to the Juvenile Act, 42 Pa. C.S.A. § 6301, *et seq*., our standard of review is abuse of discretion. When reviewing such a decision, we are bound by

- 16 -

the facts as found by the trial court unless they are not supported in the record.

*In re B.S.*, 861 A.2d 974, 976 (Pa. Super. 2004) (citation omitted).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007).

Section 6351(f) of the Juvenile Act sets forth the following pertinent inquiries for the reviewing court:

> **(f) Matters to be determined at permanency hearing.—**
>
> At each permanency hearing, a court shall determine all of the following:
>
> > (1) The continuing necessity for and appropriateness of the placement.
> >
> > (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
> >
> > (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
> >
> > (4) The appropriateness and feasibility of the current placement goal for the child.

- 17 -

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

   (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

   (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

   (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6351(f)(1)-(6), (9).

In addition:

The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." Further, at the

- 18 -

review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. "These statutory mandates clearly place the trial court's focus on the best interests of the child."

***In re S.B.***, 943 A.2d 973, 978 (Pa. Super. 2008) (emphasis in original) (citations and quotations omitted).

Here, the record reflects that the trial court appropriately considered the Children's best interests in deciding whether to change the permanency goal to adoption. The competent evidence in the record supports the trial court's determinations, as Father will not be able to provide proper parental care and control for the Children. Thus, we will not disturb them. ***See In re M.G.***, 855 A.2d at 73-74.

After careful review, we affirm the decrees terminating Father's parental rights on the basis of section 2511(a)(1) and (b), and the orders changing the permanency goals for the Children to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/7/2015

- 19 -